SCHROEDER *et al.* *v.* W. E. TRUBEE, (four cases.) SAME *v.* COMSTOCK. SAME *v.* MILLS. SAME *v.* WILLETT.

*(Circuit Court, D. Connecticut.* July 23, 1888.*

SALES—WARRANTY—FALSE REPRESENTATIONS.

> Defendants controlled the entire stock of a cigar manufacturing corporation. Their salesman negotiated a sale of the stock to plaintiffs, with a view of procuring a larger salary for himself. Plaintiffs had been called in prior thereto to advise defendants as to the proper management of the factory, and knew that they were not satisfied with their business. The salesman represented that certain dividends had been declared. When the parties met to complete a sale, in accordance with a previous appointment, defendants stated that the dividends had been earned, and that the stock account was "all right." The defendants acted in good faith. *Held*, that the statements were not representations made by a seller, for the purpose of influencing a buyer, but were statements of opinion of the condition of the property, and were not such representations or warranties as to entitle the plaintiffs to recover for a breach or failure thereof.[1]

At Law. Action for damages for breach of contract.
*William B. Hill* and *Simeon E. Baldwin*, for plaintiffs.
*Goodwin Stoddard* and *Henry Stoddard*, for defendants.

SHIPMAN, J. The seven above-entitled suits are actions at law by the same plaintiffs against different defendants, upon the same state of facts, and were tried by the court upon a written and duly signed stipulation waiving a trial by jury. The facts which were found by the court to have been proved and to be true, upon the trial of said several cases, are as follows: On December 29, 1884, a joint-stock corporation by the name of the "Vallette & Mitchell Cigar Company" was formed in this state, for the manufacture of cigars, with a capital stock of $25,000, whereof $20,000 was paid in. It was formed at the suggestion and solicitation of Alexander P. Mitchell, who, and Victor Vallette, had been salesmen for a New York cigar manufacturing house, and in that capacity became acquainted with the firm of David Trubee & Co., wholesale grocers of Bridgeport, Conn. Mitchell proposed to that firm the establishment of a corporation for the manufacture and sale of cigars, of which he and

---

[1] As to what representations amount to warranties in contracts of sale, see McClintock v. Emick, (Ky.) 7 S. W. Rep. 903, and note.

Vallette were to be members, and the goods of which they were to sell. This suggestion resulted in the formation of said corporation, all the stockholders in which, except Mitchell, Vallette, and Charles D. Mills, were members of the firm of David Trubee & Co. Mills was their book-keeper. Afterwards Samuel C. Trubee became a stockholder. At the time of the transactions hereinafter mentioned, Mitchell and Vallette each had 230 shares of stock standing in their respective names, William E. Trubee, Frederick Trubee, David Trubee, and Charles R. Willett each owned 82 shares, George Comstock and Charles D. Mills each owned 81 shares, and Samuel C. Trubee owned 50 shares. The other stockholders, or David Trubee & Co., paid the stock subscriptions of said Mitchell & Vallette, each of whom gave to the other stockholders a note for $5,750, and an assignment of his 230 shares of stock, as collateral security for the payment of said respective notes. Vallette received for his services $80 per week and 25 per cent. of the profits. Mitchell received for his services $50 per week, and each overdrew his account, and the two owed the company, in April, 1886, $2,842.10. In July, 1885, the company estimated its six months' profits to have been $8,759.20, and declared a dividend for that amount, which was not drawn, but was applied in payment of the balance of $5,000, due upon the capital stock. In January, 1886, the books showed that the profits for the second six months were only $800. As David Trubee & Co. were ignorant in regard to cigar manufacturing, William E. Trubee, the president, asked Mr. Schroeder, of the firm of Schroeder & Bon, who sold the company by far the largest portion of its tobacco, to go over to the factory, and advise them about the business, and see if there was any error in their system. Mr. Schroeder did so, went into the factory, and made some suggestions respecting the way in which the cost of the goods could be reduced, and looked at the books in regard to the expenses of manufacture, but made no thorough examination of them. Ernest Wagfugner, the foreman of the factory, was a nephew of Mr. Schroeder's, whom he had recommended for the position. He went to another factory in January, 1886, and Mr. Schroeder, at Mr. Trubee's request, recommended another person for foreman, Frederick Wagfugner, who was appointed. In February or March, 1886, Mitchell became dissatisfied with his salary, and with the amount of profits, and suggested to William E. Trubee that the Bridgeport interest should be sold and the stock thereby placed in a smaller number of owners. In consequence of this talk, Mitchell went to Schroeder & Bon, to induce them to purchase the Trubee stock; his object being to get a salary of $5,000, instead of $2,600; and told Mr. Schroeder that he thought that the Trubees would sell for the money they had put into the concern, without interest. On April 1, 1886, William E. Trubee told Mitchell that they would sell their whole interest in the stock for $20,000, the amount they had put in; the purchaser giving a good and sufficient bond for the payment of the debts of the concern, which the schedules subsequently made showed were $50,132.86. Mitchell said he had a party who would buy the stock, and on the same day wrote Mr. Trubee, at Bridgeport, the following letter:

· "NEW YORK, April 1, 1886.

"*W. E. Trubee, Esq., Pres't.*—DEAR SIR: I am prepared to accept your proposition of this date, viz., to pay you $20,000 for the entire stock and assets of the Vallette & Mitchell Cigar Co., and to furnish a party who will be satisfactory security to the Poquonnock Bank on outstanding obligations of the V. & M. Co., instead of the present indorsers. With this proviso, the names of these parties are to remain a matter of strict confidence between all parties interested. Please come down on Monday prepared to close. Yours, truly, A. P. MITCHELL."

Mitchell was not the agent of the Trubees to sell the stock, but was acting for his own interest, and in his own behalf. Trubee knew that Mitchell could not buy the stock himself, but was trying to procure somebody to make the purchase. At this time, on April 1st, Schroeder told or had told Mitchell that he and his partner, Isadore M. Bon, the two plaintiffs, would buy the stock, and pay $20,000 therefor, provided the inventory to be taken should be satisfactory, and to arrange for a meeting with Mr. Trubee to complete the purchase. The said letter of Mitchell was written in accordance with this authority. Mitchell told Charles D. Mills, the treasurer and book-keeper of the company, to have an inventory taken, which was taken by Frederick Wagfugner, the foreman, and Stephen S. Price, the shipping clerk. They went to work immediately, but it was not completed on Monday, April 5th. On that day, Schroeder, William E. Trubee, David Trubee, Mitchell, Mills, and Mr. Einstein, Schroeder's lawyer, met, in pursuance of Mitchell's notification, at the company's office in New York. Vallette was present a part of the time. Some other employes were in the room. Schroeder came with Schroeder & Bon's check for $20,000. He told the Trubees that before he paid his money, he wished to be satisfied that the statements of Mitchell were correct. Only two persons, Schroeder and Mitchell, affirmatively testify to this conversation. The other witnesses do not recollect it. Einstein was not present at the trial when the subject was under investigation. Schroeder testifies that the conversation was as follows: He said, "In the first place, I understand that the dividend was declared in January of some $8,700, and I suppose that was earned:" William E. Trubee said, "Yes." David Trubee said to Mills, "You have got it on the books; show Mr. Schroeder." Mills opened the ledger, and pointed to the dividend account. Schroeder asked, "How is the factory account?" Mills answered, "The factory is all right." Schroeder said, interrogatively, "There is no deficiency in the factory account?" Mills said, "No; that is all right." Mills also said that the inventory was not completed. Schroeder also asked if the outstandings were good. Mills said that "they charged a lot of them to profit and loss on January 1st, and there was nothing to speak of. There might be a few dollars." The bond was then discussed. Each of the parties had a form of bond. Schroeder wanted an alteration made in Trubee's, which the latter was not willing to make without consulting his lawyer; and it was agreed that he should return to Bridgeport, consult his lawyer, and that the parties should meet again on April 7th. At this time Schroeder was informed that two of the company's notes, amounting to $6,250, were about to mature, and that the

payment of these had not been provided. He said that he would send a check for the amount with which to pay the notes, which was done. On April 7th the parties met again. Schroeder asked about the profits between January 1st and April 1st, and was informed that the inventory had been completed, and that they were about $3,300. Schroeder asked, "At what value did you take the cigars?" Mills said, "Fred took the factory stock, and the other was taken by Price." The bond was signed, the $20,000 was paid by check, the stock was transferred, soon after the old directors resigned, and the management went into the hands of the plaintiffs. It does not appear that Schroeder looked at the inventory until after April 7th. On April 14th the company agreed to pay Vallette and Mitchell, each, for three years from January 1, 1886, for his services, $4,000 per annum, in equal weekly payments, and a sum equal to one-fourth of the annual net profits of the company after allowing 6 per cent. per annum interest on the capital stock. In addition, said employes could each draw $1,000 during 1886, and a like amount during each succeeding year, provided one-fourth of the net profits of the previous year should be equal to that amount. On the same day the plaintiffs agreed to sell to Mitchell and Vallette, on January 1, 1887, 1888, or 1889, 1,000 shares of said stock for the sum of $21,500 cash, upon 30 days' previous notice, and satisfactory security for the payment of the debts of the company. On April 7th Schroeder said that he proposed to cancel the notes of Vallette and Mitchell to the company, amounting to $2,842.10, which he did not consider of much value. This was done. In January, 1887, it was ascertained that in making the balance sheet of July, 1885, upon which the dividend was estimated, the furniture and fixture account of $2,255.39 was credited twice. The balance of the factory account on April 3, 1886, was $26,-518.66. The inventory of April 7, 1886, of the factory stock and property was $21,677.93, being a difference of $4,840.73. Some of the accounts turned out to be poor. Some of the cigars, and some of the tobacco, were inventoried too high in January, 1886; and on or about January, 1887, it was discovered that the company was in a very bad condition. The property was sold to the best advantage, but a very large loss was the result. All of the July, 1885, dividend was not earned; and in April, 1886, there was, as appeared by the completed inventory of April 7th, a deficiency in the factory account. There was no fraud, no willful falsehood, and there was no known or intentional misrepresentations on the part of any defendant.

The plaintiffs rely upon the principle that when owners and sellers of personal property, before the completion of negotiations for its purchase, assert material untrue representations in regard to it, which are made for the purpose of being acted upon, and were in fact relied upon by the purchaser, the truth of which the owner was bound, and is therefore presumed, to know, such representations are regarded as implying or constituting a warranty; and for a breach thereof the seller is liable. The case on the part of the plaintiffs depends entirely upon two questions by Schroeder on April 5th, the answer to one by W. E. Trubee,

and the answer to the other by Mills, and one question by Schroeder on April 7th, and the answer by Mills.    It becomes important to examine these conversations in the light of Schroeder's previous knowledge of the company, and of the defendants' ignorance of the negotiations.    Schroeder knew in January, 1886, that the company had made a dividend in July, 1885; that the officers were discontented and anxious, because they had apparently made nothing during the next six months, and that, acknowledging their ignorance of manufacturing, they had called upon him for advice in their business.    He further knew that they were ignorant of manufacturing, and that the foreman whom he had selected for them was the only competent manufacturer in the concern, and that Vallette and Mitchell sold nearly all the goods.    He knew that the anxiety for him to purchase came from Mitchell, who was acting for his own interest, and that the defendants had not solicited him to buy.    Mitchell had represented to him that the business was badly managed, and that, with proper management, the profits ought to be $15,000 or $16,000 upon annual sales of $200,000 ; and that Schroeder & Bon would be the exclusive sellers of raw material to the company.    Schroeder thought,  · from Mitchell's assertions, that he was to obtain cheaply a business which was profitable, and would become more so, and made up his mind to buy ; but he required that an inventory should be previously taken, which would show, and from which he could ascertain, the profits from January, 1886, to April, 1886.    He appointed a meeting for the purpose of closing the bargain, and W. E. Trubee, the defendants' representative, came to meet an unknown purchaser, and receive the purchase money.    Before the payment was made, Schroeder, desiring to obtain from the sellers a definite acknowledgment of the truth of Mitchell's representations, says that he therefore asked the sellers, "I understand that there was a dividend declared in July of some $8,700, and I suppose that was earned?"    The importance of this question depends upon the fact whether the word "earned" was used, and was understood by the Trubees, because Schroeder testifies affirmatively that it was used. I find that he asked that question; but from the testimony of both Mitchell and himself I find that the Trubees understood that the question related to the fact that a dividend had been declared, and so appeared on the books, and were not at all aware that they were being drawn into a warranty in regard to the accuracy of the dividend.    The answer to the question in regard to the factory account was not intended to be a positive representation of a fact, but a statement of an opinion drawn from the figures which were furnished, and which Schroeder had adequate reason to know were furnished by the foreman.    The question meant whether the figures showed that the company was getting, or was to get, proper and remunerative prices for the manufactured cigars.    The inventory had not at that time been completed, and Mills was speaking of the facts as disclosed by the estimates of the cost of manufacturing, and the values which the foreman placed upon the manufactured cigars.    The conversation on April 7th shows plainly that Schroeder could not have supposed that the answer in regard to profits from January to April was

a positive assertion that the profits were $3,300, but that from the inventory, as taken, it so appeared; because, in response to his inquiry, "At what values did you take the cigars?" Mills replied, "Fred" (*i. e.*, the foreman) "took the factory stock, and the other was taken by Price," —showing that he did not take the inventory, but relied upon the foreman's estimate.

From the whole testimony, I am of opinion:

1. That Schroeder entered upon the conversation of April 5th for the purpose of eliciting answers to questions which were asked, not so much for the purpose of influencing his own mind, because he knew that the defendants had no accurate knowledge on the subject, as to be a protection to him in case of loss after he had purchased.

2. He did not obtain, and must have been aware at the time that he did not obtain, representations in the nature of warranties. The answers to the questions were not intended to be, and were not understood by Schroeder to be, positive assertions or representations that a dividend had been earned, in the sense that no mistake had been made in the computations, or that there was no actual loss in the product upon the cost of manufacture, or that there had actually been $3,300 profits between January, 1886, and April, 1886. They were not representations made by a seller who was negotiating a sale, for the purpose of influencing a hoped-for buyer, but were statements of opinion of the condition of the property by the owners, who thought that the bargain had been concluded, to the person who presented himself as the buyer.

3. Schroeder required Mitchell to see that an inventory was taken, for the purpose of influencing his own mind, and enabling him to decide upon the purchase; but the inventory, as taken, was not, and he knew that it was not, put forth by the defendants as their statement or representation of values. It was the estimate placed by the clerks who were set at the work, and carried the weight which the known skill or the integrity of the clerks entitled it to carry. The cases have a very different atmosphere from that which they would have had, and the facts are to be looked at in a different light from that in which they would have presented themselves, if the defendants had taken the initiative in the sale, and had been solicitous for and negotiating with a purchaser.

It follows that there were not such representations or warranties as to entitle the plaintiffs to recover for a failure or breach thereof. Let judgment be entered in each case for the defendants.